UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN GONZALEZ,<br><br>    Petitioner,<br><br>  v.<br><br>JAMES A. YATES, Acting Warden,<br><br>    Respondent. | No. C 11-02670 JSW (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY** |

## INTRODUCTION

Petitioner Ivan Gonzalez, a California prisoner proceeding *pro se*, filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus. The Court ordered Respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support, and has lodged exhibits with the court.[1] Petitioner responded with a traverse.[2] For the reasons set out below, the petition

---

[1] This matter was consolidated with codefendant Ronald J. Bray's federal habeas action on February 3, 2012, to allow Respondents to lodge a single copy of the state record under Bray's action for both habeas cases. Petitioner's case was reassigned to this Court on February 6, 2012. The Court denied Bray's petition for writ of habeas corpus on August 30, 2012. *See* Case No. 09-01898 JSW (PR).

[2] Petitioner raises several new claims for the first time in his traverse, including the claim that counsel was ineffective for failing to request limiting instructions in regards to Arana's testimony and for failing to retain an independent DNA expert. However, a traverse is not the proper pleading to raise additional grounds for relief. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

is DENIED.

## BACKGROUND

### I. Procedural Background

Petitioner was jointly tried with codefendants David Tamez and Ronald J. Bray in Sonoma County Superior Court for an attack upon three men that left one man dead and the others seriously injured: Salvador Figueroa was stabbed to death, Jose Sanchez was stabbed a dozen times, and Salvador Betancourt Ceja was battered with a nanchaku that broke his nose. In July 2004, a jury convicted Petitioner of first-degree murder of Figueroa, attempted murder of Sanchez, assault with a deadly weapon against Ceja, burglary, and participation in a criminal street gang. The jury found that that all three defendants had personally inflicted great bodily injury on Sanchez, but rejected a criminal street gang special circumstance as well as criminal street gang enhancement allegations. Petitioner was sentenced to an indeterminate term of 25 years-to-life for the first-degree murder of Figueroa; a consecutive sentence of life with the possibility of parole for the attempted murder of Sanchez; a consecutive determinate upper term sentence of four years for the assault upon Ceja; and a consecutive 8-month sentence for gang participation. The remaining charges and enhancements were either stayed by the trial court or stricken by the state appellate court.

Petitioner appealed his conviction and the California Court of Appeal affirmed the conviction with a modification to strike the enhancement for personal infliction of great bodily injury as to the attempted murder charge of Sanchez. The California Supreme Court denied a petition for review. Petitioner filed state habeas petitions which were denied. Petitioner filed the instant federal petition on June 3, 2011.

### II. Factual Background

The Court of Appeal summarized the facts of the case as follows:

> The murder victim, Salvador Figueroa, shared a Cloverdale apartment with his brother and three other men, including one of the surviving victims, Salvador Betancourt Ceja. [FN2] The other surviving victim, Jose Sanchez, was a friend who often visited the apartment.

> FN2. Salvador Figueroa was also known as Salvador Figueroa Osequera. Salvador Betencourt Ceja is sometimes referred to in the record as Salvador Ceja Betencourt. Ceja is also known by the first name Ricardo.

A. *History of hostilities between the murder victim and defendant Gonzalez*

On June 30, 2001, Figueroa and defendant Gonzalez attended a wedding. Animosity arose between Figueroa and Gonzalez. Gonzalez was reportedly "looking for a fight": he made several hand gestures at Figueroa, said "things," then came up "very close" and made a stabbing gesture by moving his closed fist with knuckles toward the floor toward Figueroa's abdomen "as if [Gonzalez] was going to hit [Figueroa] with something in the stomach." Figueroa's uncle, Marco Osequera, pushed defendant Gonzalez on the shoulder and said "[l]et's step outside." Gonzalez asked "why," and "everything settled down." No physical fight occurred.

Defendant Gonzalez and Osequera did have a fight a couple months later, on August 19, 2001. Osequera was socializing and drinking beer at the Cloverdale apartment complex with about four people, including his nephew Figueroa. Defendant Gonzalez arrived with a friend to visit an occupant of one of the apartment units. Osequera was angry because Gonzalez had previously brought a drug buyer to Figueroa's apartment who turned out to be a police informant. The informant made controlled drug buys that led to a police search of Figueroa's apartment ten days earlier. Osequera, referring to the person responsible for bringing the police informant, asked Gonzalez "[w]as it you?" and Gonzalez responded "yes."

Osequera threw Gonzalez to the ground, and the men started punching each other. Gonzalez's friend separated the men, and Osequera backed away. Gonzalez jumped at Osequera, and the young men in the drinking party, which included Figueroa, chased Gonzalez and threw bottles at him. A bottle struck and cut Gonzalez's head. Gonzalez and his friend escaped in a car driven by Gonzalez's girlfriend. According to his girlfriend, defendant Gonzalez was angry and wanted to go back to the apartment complex. Gonzalez stopped at his friend's house, where the friend grabbed a bat and a couple kitchen knives. The friend said the weapons were his idea, and were just for protection against further attack. Neither Gonzalez nor his friend went back to Figueroa's apartment that night. Gonzalez and his girlfriend became embroiled in an argument because she wanted him to go to a hospital for his head injury, and Gonzalez took her car and drove off alone.

B. *Events leading up to the murder*

Defendant Gonzalez was friends with defendants David Tamez and Ronald Bray. Defendants Gonzalez and Bray lived in the same trailer park, as did a mutual friend named James Mahurin. In September 2001, about five days before the murder, Mahurin was walking with the three defendants in defendant Bray's trailer home. Defendant Gonzalez, in an angry tone of voice, said that he "got jumped" by about four men who attacked him because "[s]upposedly he brought an informant or something to their place." Gonzalez said he wanted "to go back there" to fight, in retaliation for being jumped. At trial, Mahurin was asked if Gonzalez told the group that anyone who went back with him to help fight could take any drugs and money they found there.

3

Initially, Mahurin denied the statement but later admitted that Gonzalez "possibly" made that statement.

On September 18, 2001, the day of the murder, the three defendants dropped by Mahurin's trailer to drink beer and talk. Mahurin asked Gonzalez what he was going to do that night, and Gonzalez said "[s]ee what shit we can get into." Gonzalez had used that phrase before, and Mahurin understood Gonzalez to mean that he intended to "go out and have fun." Defendants left Mahurin's trailer together around dusk, and walked toward Bray's trailer.

Defendant Bray's mother returned home from work in the early evening of September 18, 2001, to find her son drinking with his girlfriend and defendants Gonzalez and Tamez. The group talked for a couple of hours, and discussed the then-recent-9-11 terrorist attack on the World Trade Center in New York City. Gonzalez remarked to Bray's mother that "we need to kill [the terrorist Osama] [b]in Laden." Gonzalez also said, "[d]on't worry, [b]in Laden will get his just like Salvador will." [FN3]

> FN3. The murder victim's name was Salvador Figueroa. Bray's mother told a police detective about defendant Gonzalez's statement about "Salvador" before she learned the victim's name.

The three defendants left the Bray trailer, and met up at Gonzalez's home. According to Gonzalez's girlfriend, Evangelina Arana, Gonzalez asked to borrow her car, and she said no because he was not insured. Arana offered to take Gonzalez wherever he wanted to go. Gonzalez said he wanted to go to a store. Arana started driving toward the store with the three defendants in the car but Gonzalez redirected her past the store to the victims' apartment building.

Two of the victims, Figueroa and Sanchez, had been playing basketball that night with other men and returned to the apartment complex around 8:30 p.m. Sanchez saw a car in the parking lot with four occupants: a female driver and three passengers wearing red bandanas covering their faces and hooded sweaters with the hoods pulled over their heads. The driver Arana testified that defendant Gonzalez was playing with his folding work knife as he sat in the car, opening and closing the knife.

Sanchez testified that the car drove up in front of the victims, and the car occupant sitting in the rear on the passenger side yelled "puro norte" at the victims and made a hand gesture like a gun – with the thumb up, the first two fingers pointing straight out, and the other two fingers pulled in. According to the driver Arana, defendant Bray was in the rear seat on the passenger side. Arana testified that she saw Bray "thr[o]w a four" by holding out four fingers but she did not notice any other hand gestures. Arana also testified that defendant Gonzalez taunted the victims, yelling "where are your friends?" Bray yelled out of the car "What's up, putos?" Puto is a derogatory Spanish word that was variously translated at trial.

C.   *The attack and murder*

Defendant Gonzalez told Arana to park the car on a side street, and all three defendants left the car and moved together toward the victims' apartment. Arana testified that defendant Tamez picked up a stick while walking toward the apartment. Sanchez saw Gonzalez and two other men approaching, and one

4

of Gonzalez's companions had a small wooden "bat" or club in his hand, about 14 inches long. Victims Sanchez and Figueroa ran inside the apartment pursued by the three defendants. The victims ran through the living room and into a bedroom. Sanchez tried to shut the bedroom door against the force of all three defendants, who were pushing it open. One of the assailants reached inside and hit Sanchez in the face with the bat. The force of the blow caused Sanchez to release his grip on the door, and two assailants came inside the dark bedroom.

Sanchez testified that one of the two assailants went after him, and the other attacked Figueroa. The third man stood in the bedroom doorway. The man who went after Sanchez stabbed him repeatedly. Sanchez said another man stabbed Figueroa. But it was dark in the bedroom, and Sanchez was against a wall and could not always see what was happening to Figueroa across the room. It was also too dark in the bedroom for Sanchez to see which of the three defendants entered the bedroom, or who stabbed him. [FN4] Sanchez was stabbed 11 or 12 times. He suffered stab wounds to his neck, back, and arm. Some of the wounds were about five inches in length and penetrated down through the skin and fatty tissue to the muscle. Sanchez's lung was lacerated and chest blood vessels were severed. His injuries were life threatening, required emergency surgery, and necessitated hospitalization for a week.

> FN4. At trial, Sanchez initially testified that defendant Gonzalez was one of the two men who entered the bedroom. But, on cross-examination, Sanchez admitted that he did not know who entered the bedroom. Sanchez also explained that, when the police asked him "who did it" and he said Gonzalez, Sanchez meant that Gonzalez was an attacker, not that Gonzalez stabbed him.

Figueroa did not survive the attack. He died from multiple stab wounds to his chest and neck. Figueroa was stabbed eight times, including twice in the heart. One of the fatal stab wounds penetrated about six inches. A pathologist testified that there are few ways to determine whether stab wounds are made by one or more instrument, and that it was not possible to say whether Figueroa's wounds were inflicted by one knife or more. The pathologist opined that a single-edged blade caused the deeper stab wounds because the wounds are rounded on one side and bluntly squared off on the other side. The deepest wound required a blade length of at least four and one-half inches. The shallower wounds are inconclusive; they could have been made with either a double-edged knife or a single-edged knife with a tapered tip. No wounds were made with a serrated knife. Figueroa also suffered blunt trauma, bruising injuries consistent with being struck by something. Bruising was sustained on Figueroa's head, shoulder and rib areas and showed a distinct, repeating ridge patter in an "L" shape approximately six inches by one inch.

Figueroa's roommate, victim Ceja, was asleep in a different bedroom when the attack began. Ceja awoke to the sound of fighting and escaped through a bedroom window. Once outside, Ceja saw a man leave the apartment and come toward him with a nunchaku, which is a weapon made of two sticks connected with a chain. At trial, defendant Bray was identified as the owner of a nunchaku by several people.

The assailant struck Ceja in the face and on the arm with the nunchaku. The force of the blow to Ceja's face was so great that it lacerated his face, broke his nose, and required a physician to scrape the weapon's paint off Ceja's nasal

5

bone. In addition to the man who attacked Ceja, Ceja also reported seeing two other men leave the apartment.

A neighbor heard noise coming from the victims' apartment, and Ceja ran up with a bloody nose and said he had been "beaten up with some chukkas." The neighbor saw a man wearing a "kerchief" over his face fleeing toward the street, and the neighbor threw a lunch pail at the assailant but missed hitting him. The assailant stopped and picked up the lunch pail and the neighbor ran back inside his apartment. The lunch pail broke through the window.

The three defendants turned to Arana's car. Defendant Bray was carrying a nunchaku and defendant Gonzalez had his work knife, with blood on it. Arana drove away, and Gonzalez told Bray that Gonzalez "had gotten them back." Bray replied that he "had hit somebody in the face with the nunchakas [sic]." Defendant Tamez said that he "kicked" and "hit somebody with a stick."

D.   The arrests

Arana drove defendants Tamez and Bray to Bray's trailer home, then took Gonzalez to work at the Asti Winery. Gonzalez operated a wine filter, where a cutting tool is useful for opening bags. But Gonzalez did not take his work knife with him that night. Gonzalez told Arana to "get rid of" his knife, and she drove to Lake Sonoma and dropped the knife in the water. Victim Sanchez identified Gonzalez as one of the assailants, and the police arrested Gonzalez at work. Gonzalez did not have his customary work knife on him when he was arrested.

Gonzalez's home was searched and the police found, in his bedroom, gang-related items including red clothing (Norteno gangs wear red clothes), photographs of people "throwing" hand signs associated with the Norteno gang, and a videotape entitled "Connected by Honor," a video made by and for Norteno gang members that glorifies gang life. The police questioned Gonzalez's girlfriend, Arana, and she identified defendants Bray and Tamez as Gonzalez's accomplices in the attack.

The police went to Bray's home with a search warrant, and he refused their demands to come outside. The police kicked in the door. The police noticed abrasions on Bray's knuckles. Bray's girlfriend made the same observation the night before when Bray turned home with Tamez, and also noticed that Bray had a swollen lip. Bray told his girlfriend that he had been in a fight in Cloverdale.

The police searched Bray's bedroom and found a plastic and foam nunchaku; no wooden nunchaku was recovered. The police also discovered shoes with Tamez's blood on them, a red bandana, and two knives. One knife, a "survival type" serrated knife with a compass on top, was found in a safe in the closet in Bray's bedroom. Another knife, found in a dresser drawer, was a single-edged, tapered-blade knife with a multi-colored handle and brown sheath. "VHN" was carved into the sheath with "X" and "4" scratched in between the three letters. "VHN" is a known designation for the Varrio Healdsburg Norteno gang, and X4 is a gang symbol for 14, a number used by the Norteno gang (because the letter "N" of Norteno is the 14th letter of the English alphabet). Bray's bedroom also contained a compact disk with Norteno rap music, a Norteno cartoon, and photographs of Bray "throwing" gang signs and socializing with known gang members.

The police also arrested defendant Tamez the morning after the murder, and searched the house where they located him. The police found two wooden dowels tied with a red bandana, and other items of red clothing. There was a wooden sign on the wall with "H-Town" in red. "H-Town" is a Norteno gang. The "H" stands for Healdsburg, a town near Cloverdale. A search of the residence also found photographs depicting known gang members, billy clubs, and a newspaper article reporting a Norteno attack on a rival gang member.

At the time of his arrest, Tamez had several gang tattoos on his body: a joker figure holding a smoking gun (Tamez's gang moniker is "Joker"); the number 14; "WSN" (for Westside Windsor, a Norteno gang); and the word "Norte" in large letters across his upper back. Norte is short for Norteno, meaning Northerner. The police also saw that Tamez had an open, two-inch cut on his left forearm. At trial, the treating physician testified that the "most likely" cause of the injury was "a knife sharp instrument." Tamez told the arresting police officers that he had cut himself the night before while on the living room couch, and pointed the police to a serrated kitchen knife on the floor next to the couch. Tamez said he kept the knife next to the couch for protection, in case someone broke into the house. The knife was photographed but not collected as evidence.

A trail of blood was found at the murder scene that ran from the apartment building to the street. It was Tamez's blood. Tamez's blood and fingerprint were also found in Arana's car.

E. *Expert testimony on gangs*

Detective James Lane of the Santa Rosa Police Department testified as an expert on criminal street gangs. He described the formation in California of the rival Surenos (Southerners) and Nortenos (Northerners) gangs, and the various symbols they use to identify themselves. Detective Lane explained that a gang's ability to instill fear is the source of its power, so a gang works hard to maintain its reputation for violence. Gang members will retaliate if one of their members loses a fight in order to retain the gang's reputation. Detective Lane described several recent crimes committed by the Norteno gang, including shootings and stabbings in rival gang territory.

The detective opined that defendants were Norteno gang members at the time of the September 2001 attack at the Cloverdale apartment. Detective Lane based his opinion about defendant Tamez on a number of points, including the reports of other police officers that Tamez identified himself to those officers as a Norteno gang member in 1996, 1997, and 1999. The detective also noted that Tamez associated with, and had been previously arrested with, known Norteno gang members. Tamez also had gang tattoos on his body (including the word "Norte" written in large letters across his back), dressed in red clothing, and was arrested in a house containing gang paraphernalia and billy clubs that could be used as weapons. Detective Lane observed that it was common for gang members "to have weapons available inside their houses."

In concluding that defendant Bray was a gang member, the detective relied upon Bray's previous police detentions and contacts from 1998 to 2001. On two occasions in 1998, Bray was stopped in vehicles containing known Norteno gang members. On one of those occasions, Bray and a Norteno gang member were seen leaving the area of a reported fight. In 1999, Bray was again stopped by the police, and cited for alcohol violations, while in the company of

a Norteno gang member. That same year, Bray was assaulted by Sureno gang members. Bray was arrested in both 2000 and 2001, and each time he was wearing red clothing and armed with a knife. In early 2000, Bray admitted to the police that he was an associate of the H-Town Norteno gang but had not been "jumped in," meaning that he was a gang participant but not yet a full-fledged member. The detective further noted that Bray had knives and gang paraphernalia in his bedroom at the time of his arrest.

Detective Lane testified that defendant Gonzalez had numerous police contacts since 1996, and was often in the company of known Norteno gang members. In 1996, Gonzalez painted gang graffiti, including "Norte 14." In 1996 and 1999, Gonzalez was with known gang members when arrested for assault. In the latter incident, Gonzalez stabbed a Sureno gang member. In 1999, Gonzalez was with a Norteno gang member who scratched "XIV" on a car. In 2000, Gonzalez reportedly struck a woman for dating a Sureno, and was arrested in the presence of Norteno gang members. The detective also observed that Gonzalez, like Bray, had gang paraphernalia in his home at the time of his arrest in the present case.

Defendant Bray presented his own expert on criminal street gangs, James Hernandez, a professor of criminal justice. Professor Hernandez opined that defendants were not active participant in a criminal street gang. The professor testified that "part of youth is looking for an identity," and being a Norteno is an identity. Some individuals claiming to be Nortenos are "hard core guys" who are actual gang members committing street crimes but others "are just kind of doing their thing" and adopting an identity without engaging in criminal activity. Professor Hernandez maintained that the general designation Norteno is not a gang; only specific subsets are gangs. The professor acknowledged that defendant Bray previously claimed association with a specific Norteno subset based in Healdsburg but opined that Bray was not an active gang member and based that opinion on the fact that Bray had since moved away to a different town. The professor cited a statistic that 69 percent of individuals in a gang stay for a year or less. Professor Hernandez also opined that the attack at the Cloverdale apartment was the result of a personal vendetta.

On cross-examination, the professor conceded that the Norteno subset Westside Windsor is a gang and opined that defendant Tamez was a gang member when he was tattooed with that gang's name. However, Professor Hernandez emphasized that "people change." On a similar basis, the professor dismissed evidence that Bray had a knife sheath marked with the name of a Norteno subset. Professor Hernandez suggested that it was not clear when the sheath was carved with the gang name. As for defendant Gonzalez, the professor concluded that Gonzalez identifies with the Nortenos but found "no structural involvement with a subgroup."

F.  *Verdict*

A jury convicted all three defendants of first degree murder of Figueroa (§ 187, subd. (a); count one); attempted premeditated murder of Sanchez (§§ 187, subd. (a), 664; count two); assault with a deadly weapon upon Ceja (§ 245, subd. (a)(1); count four); burglary (§459; count five); and participation in a criminal street gang (§ 186.22, subd. (a); count six). The jury found that each defendant personally inflicted great bodily injury on Sanchez (counts two and

five) but found only defendant Bray liable on that enhancement for the assault upon Ceja. (§12022.7, subd. (a).) The jury rejected allegations that the murder, attempted murder, assault, and burglary were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) The jury likewise rejected the special circumstance allegation that Figueroa's murder was carried out to further the activities of a criminal street gang. (§ 190.2, subd. (a)(22).)

Ans. Ex. 6 at 2-11.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority under the first clause of Section 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

9

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome section 2254(e)(1)'s presumption of correctness; conclusory assertions will not suffice. *Id.* Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

When it is clear that a claim was not adjudicated on the merits in state court, for instance because the state court invoked a procedural rule that is not a procedural bar to considering the claim in the federal habeas proceeding, the claim is subject to *de novo* review. *See Williams v. Cavazos*, 646 F.3d 626, 637-39 (9th Cir. 2011) (conducting *de novo* review after concluding Sixth Amendment constitutional claim was squarely raised on direct appeal but not addressed by the state court which gave a lengthy, reasoned opinion denying the appeal based on state statute), *cert. granted*, 132 S. Ct. 1088 (2012); *see also Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002) (after concluding that claim was not procedurally barred, conducting *de novo* review because state supreme court never reached merits of the claim).

## ANALYSIS

Petitioner presents the following claims as grounds for federal habeas relief: (A) he received ineffective assistance of counsel; (B) Petitioner's sentence violates his rights under the Double Jeopardy Clause; and (C) there was insufficient evidence to support his conviction.

### A. Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered ineffective assistance for the following: (1) failure to request limiting instructions; (2) failure to suppress statements taken

in violation of *Miranda*[3] during an in custody interrogation; and (3) failure to challenge a star prosecution witness's grant of immunity and perjured testimony.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must show: first, that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Id.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689.

### 1. Failure to Request Limiting Instructions

Petitioner claims that counsel rendered ineffective assistance for failing to request a more specific limiting instruction regarding hearsay testimony that was relied upon by the gang experts in forming their opinion.

The Court of Appeal reviewed what occurred at trial and then rejected this claim:

> Defendants argue that their trial attorneys rendered ineffective assistance of counsel by agreeing to a prosecution-drafted jury instruction limiting the use of hearsay relied upon by the expert witnesses on criminal street gangs. Defendants insist that trial counsel should have requested a differently-worded limiting instruction.
>
> The parties agreed to the following instruction, which was read to the jury: "Evidence has been introduced through the testimony of Detective Jim Lane and Professor James Hernandez regarding prior contacts between the defendants and law enforcement members; acts committed by the defendants and predicate[] offenses involving other persons. This evidence is not to be used as evidence of bad character or to show a propensity to commit certain crimes. The limited purpose of this evidence is to determine the basis of the opinion of the expert[s] regarding gang affiliation." When the instruction was discussed and adopted, defendant Tamez's trial attorney remarked that the "instruction is well worded and I think it's a good instruction."
>
> On appeal, defendants argue that their trial attorneys were incompetent for

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

11

agreeing to the limiting instruction as worded, and should have insisted on a different version previously proposed by the defense. That version consisted of two related instructions. The first proposed defense instruction stated: "Evidence has been introduced that the defendants are members of a criminal street gang or gangs. Such evidence, if believed, was not received, and may not be considered by you, to prove that the defendants are persons of bad character, or that they have a disposition to commit crimes." The second defense instruction stated: "Evidence has been introduced through the testimony of Det. [*sic*] James Lane about prior contacts of the defendants with law enforcement, prior bad acts committed by the defendants, and predicate offenses committed by other persons. This evidence is to be considered by you only to establish the basis for the Det. [*sic*] Lane's opinions, and not for the truth of the matters stated therein."

Defendant Gonzalez argues (and his codefendants join in the argument) that the instruction read to the jury "omitted a crucial element" that was contained in the second instruction proposed by the defense, "to wit, that the voluminous hearsay evidence that Lane acquired from police reports, interviews with other gang members, and interviews with other law enforcement agents was not admissible for its truth." There was no omission.

The jury was clearly advised that the hearsay evidence was to be used solely to determine the basis of the experts's opinions, and for no other purpose. The jury was expressly told that the evidence was not to be used as evidence of bad character or to show a propensity to commit crimes. While the instruction did not use the exact phrase now advocated by defendants, the instruction clearly advised the jury that the evidence was not to be used to show the "truth of the matters stated" in the evidence, that is, not to be used to show that defendants committed prior crimes. The jury was firmly admonished that the evidence was admitted for the limited purpose of establishing the basis for the experts' opinions. Further elucidation was unnecessary. There is no reasonable likelihood that the jury misunderstood the limiting instruction, especially in light of the prosecutor's closing argument that "[t]he only way you can use" the information about defendants' prior police contacts "is for the purposes of looking at the expert opinion of the witness" in deciding whether defendants were gang participants. The prosecutor cautioned the jury that "[y]ou can't say, well, you know, we heard something about Ivan Gonzalez stabbing a Sureno, therefore, there's this propensity to stab. No. Limited purpose. Only for purposes of the expert's opinion."

Moreover, it is not reasonably probable that the defendants would have been acquitted had the instruction specifically stated that hearsay used by Detective Lane in formulating his opinions could not be used "for the truth of the matters stated." The evidence of defendants' guilt was overwhelming. Defendants were placed at the scene of the crime by numerous witnesses and forensic evidence. Defendants also made damning admissions. Defendant Gonzalez threatened that Figueroa would "get his" and, after the stabbings of Figueroa and Sanchez, bragged that he "had gotten them back." Defendants Tamez and Bray likewise bragged about their participation in the attack. A jury instructed in slightly more detail about hearsay evidence would not have rendered a different verdict.

Ans. 6 at 20-22.

Petitioner's claim is without merit. The state appellate court reasonably determined

that the agreed-upon instructions clearly stated that the hearsay testimony could only be used for a limited purpose, i.e., "to determine the basis of the opinion of the expert[s] regarding gang affiliation" and "not to be used as evidence of bad character or to show a propensity to commit certain crimes." *See supra* at 11. This instruction was sufficient to admonish the jury not to consider the hearsay testimony for any other purpose, including "the truth of the matters stated." Counsel is entitled to a strong presumption that his decision to agree to these clear instructions was objectively reasonable by professional norms. *Strickland*, 466 U.S. at 689.

        Furthermore, Petitioner was not prejudiced by counsel's failure to insist upon more specific instructions. First of all, it was not likely the jury used the hearsay testimony for the truth of the matter stated notwithstanding the lack of specific instructions to that effect because the prosecutor emphasized in his closing argument that "'[t]he only way [the jury] can use' the information about defendants' prior police contacts 'is for the purposes of looking at the expert opinion of the witness' in deciding whether defendants were gang participants,'" and he again repeated, "Limited purpose. Only for purposes of the expert's opinion." *See supra* at 12. Furthermore, the jury was not likely to have rendered a different verdict even had it been given more specific instructions because, as the state appellate court reasonably determined, the evidence of Petitioner's guilt was overwhelming: Petitioner was placed at the scene of the crime by numerous witnesses and forensic evidence; Petitioner made "damning admissions"; and Petitioner "threatened that Figueroa would 'get his' and, after the stabbings of Figueroa and Sanchez, bragged that he 'had gotten them back.'" *Id.* Petitioner has failed to show that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Accordingly, the state courts' rejection of this claims was not objectively unreasonable, and this claim is DENIED as without merit. 28 U.S.C. § 2254(d).

        **2.    Failure to Suppress Statements**

        Petitioner's second ineffective counsel claim is that counsel failed to move to suppress statements taken in violation of *Miranda*. Respondent argues that Petitioner did not raise this

13

claim in either his direct appeal or in any of his state habeas petitions, and therefore the claim is unexhausted.

The court may deny a petition on the merits even if it is unexhausted. *See* 28 U.S.C. § 2254(b)(2). The court may do so, however, "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005). This is indeed the case with respect to this *Miranda* claim as Petitioner fails to identify the specific statements which he attempts to challenge. In fact, it does not appear that any statements by Petitioner to police were admitted or even mentioned at trial. The evidence against Petitioner was comprised mostly of eyewitness identifications and the testimony of Petitioner's girlfriend. Nowhere in the facts is it stated that Petitioner made inculpatory statements to police prior to being advised of his rights under *Miranda*, or that any such statements were improperly admitted at trial. Furthermore, there is absolutely no mention of any in custody interrogation of Petitioner. As such, it cannot be said that counsel rendered ineffective assistance for failing to suppress statements that did not come in at trial. Accordingly, this claim is DENIED as without merit. *See Cassett v. Stewart*, 406 F.3d at 623-24.

### 3. Failure to Challenge Testimony

Petitioner claims that counsel was ineffective for failing to challenge a "star prosecution witness's grant of immunity purjuried [*sic*] testimony," Pet. at 6, but does not identify this witness by name in his petition. In response, Respondent asserts that this witness can only be Eva Arana, Petitioner's girlfriend, who was the only witness who received immunity for her testimony. Although this claim appears to be unexhausted,[4] the Court may consider it on its merits to decide whether dismissal is appropriate. *See* 28 U.S.C. § 2254(b)(2); *Cassett v. Stewart*, 406 F.3d at 623-24.

This claim is without merit. First of all, Petitioner fails to provide any evidence to

---

[4] Respondent argues that Petitioner did not raise this claim on direct review and only "peripherally" on state habeas as a "single sentence portion of his complaint that counsel rendered ineffective assistance by failing to challenge the *sufficiency of evidence* of his substantive convictions." Ans. at 13. Petitioner has failed to show otherwise.

support his claim that Arana perjured herself. Petitioner asserts in his traverse that she had "an axe to grind" against him and that she had an incentive to lie in exchange for leniency. Trav. at 3. However, Petitioner does not explain why Arana would be motivated to give false testimony against him. Rather, Arana was granted immunity so that she would testify truthfully without fear of prosecution. Arana was also reminded at the beginning of direct examination that she would not be free from prosecution if she was untruthful. 30RT 4623. Furthermore, to ensure the accuracy of her testimony, Arana was allowed to refresh her memory by referring to the transcript of her testimony from the preliminary hearing. 30RT 4675, 4677, 4686, 4719-22. Based on this record, there is nothing to suggest that Arana perjured herself while on the stand.

Not only is there no evidence that Arana committed perjury, counsel was not deficient in attacking her credibility. Counsel elicited several admissions from Arana about her previous lies to police, which were also preemptively raised by the prosecution. 30RT 4738-39, 4750-53, 4760-62; 31 RT 4801-05, 4812-13, 4823-25.[5] Counsel also repeatedly attacked Arana's credibility during his closing argument, urging the jury to "throw out" her testimony. 42RT 6461, 6454-59, 65, 68-69. Ultimately, Arana's credibility was a matter for the jury to decide and consider in their deliberations, and counsel's conduct in bringing it into question was objectively reasonable and did not fall below professional norms. The Court need not address the prejudice prong of the *Strickland* test since Petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Accordingly, this claim is DENIED as without merit.

B. **Double Jeopardy**

Petitioner claims that the trial court violated Double Jeopardy when it imposed "upper term enhancements baised [sic] on lesser included offences [sic], that [sic] state court found true but are <u>unreasonable</u> in light of clear and convincing evidence in the record." Pet. at 6

---

[5] In his traverse, Petitioner cites to the same pages as Respondent in the transcript to support his claim that Arana committed perjury, Trav. at 3, but as discussed above, these are instances where Arana admitted during cross-examination that her previous statements to police had been false rather than proof that her testimony at trial was untruthful.

(emphasis in original). This claim is also unexhausted and will be reviewed under 28 U.S.C. § 2254(b)(2). *See Cassett v. Stewart*, 406 F.3d at 623-24.

Petitioner was sentenced to an indeterminate term of 25 years-to-life for the first-degree murder of Figueroa (count 1); a consecutive sentence of life with the possibility of parole for the attempted murder of Sanchez (count 2); a consecutive determinate upper term sentence of four years for the assault upon Ceja (count 4); and a consecutive 8-month sentence for gang participation (one-third the mid-term) (count 6). The court imposed a 4-year upper term sentence for the burglary charge (count 5), with an enhancement for infliction of great bodily injury, but then stayed the sentence and enhancement under California Penal Code § 654. The state appellate court struck a three year enhancement for inflicting great bodily injury in connection with the attempted murder of Sanchez in count 2 as to all defendants because there was insufficient evidence to show which of the defendants actually inflicted the injury.

Petitioner's claim is without merit. As pointed out by Respondent, the only enhancement that was imposed was a three year term for inflicting great bodily injury in connection with counts two and five. Petitioner's claim that he was unlawfully sentenced to an "upper" term enhancement is factually incorrect because there is no range of upper, lower and middle terms under California Penal Code § 12022.7(a), under which the enhancement was imposed – only a single three-year term. Furthermore, it cannot be said that Petitioner was actually doubly punished for either enhancement because the enhancement in connection with the burglary charge was stayed and the enhancement in connection with the attempted murder charge was struck on appeal. Accordingly, this claim is DENIED as without merit.

C.  **Insufficient Evidence**

Petitioner's final claim is that there was insufficient evidence to support his conviction because he was "convicted on circumstantial evidence that is contrary to federal law wherein the state failed to apply the correct controlling Supreme Court Authoritys [*sic*]." Pet. at 6. However, Petitioner fails to specify which conviction he is challenging. At a minimum, Petitioner's pleading must "specify all the grounds for relief available to [him]" and to "state

the facts supporting each ground." Rule 2(c), Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254; *see also Hendricks v. Vasquez*, 908 F.2d 490, 491-92 (9th Cir. 1990) (habeas petitioner must state his claims with sufficient specificity); *Wacht v. Cardwell*, 604 F.2d 1245, 1246-47 (9th Cir. 1979) (same). Conclusory allegations in a habeas petition fail to state a claim. *See Allard v. Nelson*, 423 F.2d 1216, 1217 (9th Cir. 1970). Petitioner provides no clarification in his traverse. Respondent points out that the only insufficiency of evidence claim he pursued in direct appeal was successful, i.e., that there was insufficient evidence to prove the infliction of great bodily injury in conjunction with the attempted murder of Sanchez (count 2). As discussed above, the Court of Appeal struck the enhancement. *See supra* at 2, 16. Thus a federal habeas claim involving this particular enhancement charge is moot.

Assuming that Petitioner is challenging the sufficiency of evidence as to all his convictions – for first-degree murder of Figueroa, attempted murder of Sanchez, assault with a deadly weapon against Ceja, burglary, and participation in a criminal street gang – Petitioner is only entitled to relief if the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings . . ." *Coleman v. Johnson*, No. 11-1053, slip op. at 1 (U.S. May 29, 2012) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, slip op. at 7 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

Viewing the evidence in the light most favorable to the prosecution, there was more than sufficient evidence to support each of Petitioner's convictions: there was a history of violent hostilities between Petitioner and Figueroa; it was known that Petitioner wanted revenge on Figueroa; eye-witnesses placed Petitioner at the scene of the crime; the victims identified Petitioner as one of the attackers who entered the apartment; Petitioner had a history of gang association; there was gang paraphernalia in Petitioner's home; and expert testimony opined that Petitioner was a member of a gang. *See supra* at 3-8. Although Petitioner argues that the evidence was "circumstantial," even circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *See Walters v. Maass*, 45 F.3d at 1358. Accordingly, this claim is DENIED as without merit.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: APR 0 9 2013

JEFFREY S. WHITE
United States District Judge

Gonzalez02670_denyHC.hhl.wpd

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

IVAN GONZALEZ,

        Plaintiff,

v.

JAMES A YATES et al,

        Defendant.

Case Number: CV11-02670 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 9, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Ivan Gonzalez
V-59290
Pleasant Valley State Prison
PO Box 8500
Coalinga, CA 93210

Dated: April 9, 2013

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk